# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE

## STATE OF TENNESSEE v. CHARLES CHESTEEN

**Direct Appeal from the Criminal Court for Cocke County**
**No. 7221, 7222    Hon. Kindall T. Lawson, Judge, sitting by interchange**

---

### No. E1999-00910-CCA-R3-CD - Decided June 8, 2000

---

The defendant, Charles Chesteen, served as the Clerk and Master of the Cocke County Chancery Court from 1984 to 1996. In 1997, he was charged with theft relating to his service in the capacity as conservator of funds of two elderly ladies and with unlawful conversion related to funds misappropriated by him in his official capacity. He pleaded guilty, with the sentencing determination to be made by the trial court. The court imposed an effective six-year incarcerative sentence along with restitution of $101,821.73. Upon review, we hold that the trial court erred in some of its sentencing determinations. We affirm in part, modify in part, reverse in part, and remand to the trial court for further determination regarding aspects of the sentencing issues.

**T.R.A.P. 3; Judgment of the Criminal Court Affirmed in part, Modified in part, Reversed in part, and Remanded**

WITT, J., delivered the opinion of the court, in which WADE, P.J., joined and TIPTON, J., concurred by separate opinion.

Edward C. Miller, District Public Defender, for the appellant, Charles Chesteen.

Paul G. Summers, Attorney General and Reporter, Patricia C. Kussman, Assistant Attorney General, Alfred C. Schmutzer, Jr., District Attorney General, W. Brownlow Marsh, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

Charles Chesteen stands convicted upon his guilty pleas of theft of property valued at $10,000 or more, a Class C felony, and embezzlement in his official capacity as clerk and master, a Class C felony. See Tenn. Code Ann. § 39-14-103, -105(4) (1997) (theft of property); Tenn. Code Ann. § 18-2-105 (1994) (embezzlement by clerk and master in official capacity). Having received concurrent incarcerative sentences of six years on each conviction accompanied by an order of restitution of $101,821.73, Chesteen appeals. We have considered the oral arguments and the briefs of the parties along with the applicable law. We affirm the length of the six-year effective sentence but modify the manner of service to split confinement of one year in confinement followed by

fourteen years of probation. We reverse the trial court's determination regarding restitution in both convictions and remand to that court for a determination of proper restitution. Finally, we affirm the trial court's denial of judicial diversion.

Charles Chesteen, 39 years old at the time of sentencing, assumed the duties of the office of Clerk and Master of the Cocke County Chancery Court in 1984 and held the office until 1996. Apart from his duties as clerk and master, he was appointed in 1987 to be financial conservator of the funds of Narcissa Spurgeon and Mary Spurgeon, two elderly ladies who were no longer able to manage their own financial affairs. By his own admission, Chesteen began taking money from the Spurgeons' accounts for his personal use approximately one year after his appointment as conservator. According to Chesteen, he believed he would be able to repay the money at some point. Thereafter, Chesteen also began misappropriating funds of various litigants which were in the custody of the office of the clerk and master. Chesteen claimed that he had used the Spurgeon funds for necessary personal and family expenses, not extravagances. He further claimed that the funds he took from the clerk and master's office were used for further personal and family expenses, as well as to meet the expenses of one or both of the Spurgeons' continued nursing home care after he had depleted those funds.[1]

After Chesteen left office, the successor clerk and master, Craig Wild, discovered irregularities which ultimately led him to request an audit by state officials. That audit uncovered a shortage of $101,821.73 in the office of the clerk and master. The audit also revealed that Chesteen had established various unofficial bank accounts through which he funneled funds entrusted to him as clerk and master and ultimately used them for personal and family expenses and the continued care of one or both of the Spurgeons. Chesteen's scheme included the preparation of orders reciting false factual premises, which he presented to various judges for signature without their knowledge of the falsity.

Initially, Chesteen was not of any measurable assistance to Clerk and Master Wild or the state auditors in uncovering the scheme. However, he did eventually meet with the auditors as well as law enforcement authorities and provide details about his activity. By this time, the audit had been completed, so Chesteen's explanation was of no assistance in investigating the matter other than to corroborate what had already been uncovered. Chesteen advised the authorities that he had destroyed records relative to the funds taken.

The state presented evidence that Chesteen's actions caused great distress to the Spurgeons in their declining years and deprived the beneficiaries of the Spurgeons' wills of the residual estate to which they were entitled. Further, Chesteen's actions deprived various litigants and other individuals of funds held for their benefit by the office of the clerk and master. Seventeen-year-old Sarah Mantooth, a single parent, was deprived of the proceeds of her deceased father's life insurance policy, which she had planned to use to pay for her college education. Miss Mantooth

---

[1]It is not clear from the record whether some of the funds diverted from the clerk and master's office were used for Mary Spurgeon's expenses or for both Spurgeons' care.

testified that she would probably be unable to pursue higher education without the money.[2]

Chesteen testified that he was a life-long Cocke County resident with a high school diploma and an associate's degree. His father passed away when he was eight, and he began working at age twelve. At the age of nineteen, Chesteen married a woman who is fourteen years his senior. He raised her three children as his own, assuming parental and financial obligations for them. When he was appointed to the office of clerk and master, he was paid approximately $21,000 per year, and when he left the position he was earning approximately $38,000 to $39,000 per year. Since leaving the office of clerk and master, Chesteen has worked in various positions. At the time of the sentencing hearing, he was earning approximately $8.00 per hour but was poised to assume a managerial position that would pay $23,000 per year plus consulting fees for additional work.

At the hearing, Chesteen admitted wrongdoing and expressed his remorse and desire to make restitution to his victims. He testified that his actions had caused him to suffer various ailments over the years, including anxiety and depression. Chesteen claimed that he took the money due to his inability to meet the financial demands of his family on his salary. He testified that his wife suffers from a panic disorder known as agoraphobia and is unable to leave their home unless he accompanies her and then only in limited circumstances. Although Mrs. Chesteen worked for a time during their marriage in a job she was able to do from home, in more recent years she has been unable to work outside the home and has been unable to obtain disability benefits for her condition. Mrs. Chesteen is also limited by other medical conditions, including arthritis. She is highly dependent on the defendant to attend to her personal needs and do the household chores. Other family members corroborated the extent of Mrs. Chesteen's limitations. The defendant and his daughter both testified that they did not envision Mrs. Chesteen being able to remain in the home if the defendant were incarcerated. He is needed to support her financially as well as to attend her daily needs.

Relatives of the defendant testified about the defendant's tremendous guilt for his crimes, his exemplary fulfillment of his parental role to Mrs. Chesteen's three children, and the great improvements Mrs. Chesteen has made through the years with the defendant's support.

Along with an application for judicial diversion, Chesteen submitted documentation of his and his wife's medical concerns and letters of support from numerous acquaintances attesting to his suitability for non-incarcerative sentencing.

Having heard the evidence, the trial court imposed maximum, six-year terms for the defendant's crimes. The sentences were to be served concurrently. The trial court engaged in extensive discussion of local incarceration with work release; the judgment forms, however, reflect that the sentence on both counts is to be served in the Department of Correction. The trial court ordered restitution of $101,821.73 to be paid incident to the official misconduct conviction. The trial

---

[2]Although not relevant to these proceedings, there was evidence that at least some of those harmed by Chesteen's actions had civil litigation pending against him.

court never explicitly ruled on Chesteen's application for judicial diversion.

In this appeal, Chesteen challenges the trial court's denial of judicial diversion as well as the length and manner of service of his sentence. We consider first the issue of the propriety of the sentence imposed.

When there is a challenge to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a *de novo* review of the record with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d) (1997). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). "The burden of showing that the sentence is improper is upon the appellant." Id. In the event the record fails to demonstrate the required consideration by the trial court, review of the sentence is purely *de novo*. Id. If appellate review reflects the trial court properly considered all relevant factors and its findings of fact are adequately supported by the record, this court must affirm the sentence, "even if we would have preferred a different result." State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

In making its sentencing determination, the trial court, at the conclusion of the sentencing hearing, determines the range of sentence and then determines the specific sentence and the propriety of sentencing alternatives by considering (1) the evidence, if any, received at the trial and the sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct involved, (5) evidence and information offered by the parties on the enhancement and mitigating factors, (6) any statements the defendant wishes to make in the defendant's behalf about sentencing, and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. § 40-35-210(a), (b) (1997); Tenn. Code Ann. § 40-35-103(5) (1997); State v. Holland, 860 S.W.2d 53, 60 (Tenn. Crim. App. 1993).

The defendant was sentenced for his Class C felonies as a Range I offender. The range of punishment in this case is three to six years. Tenn. Code Ann. § 40-35-112(a)(3) (1997).

The record reflects that the trial court considered the appropriate factors; however, the court misapplied enhancement and mitigating factors. Additionally, as discussed below, the trial court made inappropriate restitution determinations. Thus, our review is *de novo* unaccompanied by the presumption of correctness.

## I. Length of Sentence.

The trial court applied enhancement factors (3), (4) and (15) to each conviction. See Tenn. Code Ann. § 40-35-114(3), (4), (15) (1997).

First the trial court found that the defendant's crimes involved more than one victim. See Tenn. Code Ann. § 40-35-114(3) (1997). The defendant does not challenge the application of this factor. See State v. Williamson, 919 S.W.2d 69, 82 (Tenn. Crim. App. 1995) (enhancement

factor (3) appropriate if defendant not separately convicted of offenses against each victim); State v. Raines, 882 S.W.2d 376, 384 (Tenn. Crim. App. 1984) ("victim" for purposes of enhancement factor (3) is "a person or entity that is injured, killed, had property stolen, or had property destroyed by the perpetrator of the crime"). We apply factor (3) to the theft conviction, because the defendant harmed the two Spurgeon wards. We accord this factor substantial weight.[3] The defendant's official misconduct conviction may fairly be viewed as a crime against the office of the clerk and master. See Tenn. Code Ann. § 18-2-105 (1994). Although the individuals whose funds were unlawfully converted while in the custody of the office of the clerk and master are not the victims under the statute, they are victims of this crime under Raines for purposes of enhancement factor (3). In view of the numerous victims of the official misconduct conviction, the factor is entitled to significant weight for that offense.

The trial court also enhanced the sentences because Chesteen's victims were "particularly vulnerable because of age or physical or mental disability." See Tenn. Code Ann. § 40-35-114(4) (1997). The defendant argues that this factor should not apply to either conviction because there was no interaction between the victims and the defendant in perpetration of the crime, and thus, the result would be the same whether or not the victims were of a young or advanced age or mentally disabled. See State v. Seals, 735 S.W.2d 849, 853-54 (Tenn. Crim. App. 1987) (factor not applicable because crime involved theft from mailboxes and result would be the same if victims had been "robust athletes"). In our determination, we are guided by our supreme court's pronouncement that the sentencing court should consider

> (1) whether the victim, because of age or mental or physical attributes, was particularly unable to resist the crime, summon help, or testify at a later date; (2) whether [the] victim's age (extremely old or extremely young) is entitled to additional weight; and (3) whether the vulnerability of the victim made the victim more of a target for the offense, or, conversely, whether the offense was committed in such a manner as to render the vulnerability of the victim irrelevant.

State v. Walton, 958 S.W.2d 724, 729 (Tenn. 1997) (citing State v. Poole, 945 S.W.2d 93, 96-97 (Tenn. 1997)).

On the record before us, the state has established by a preponderance of the evidence that this factor should apply to the theft conviction. See State v. Carter, 908 S.W.2d 410, 413 (Tenn. Crim. App. 1995) (preponderance of evidence required to establish applicability of enhancement factors). The evidence showed that both Narcissa and Mary Spurgeon were incompetent to handle their financial affairs and confined to a nursing home prior to their deaths, and there was evidence that the defendant anticipated them to pass away more rapidly than they did. By reason of a court making the necessary findings to support the appointment of conservator, the Spurgeons were in need of "supervision, protection and assistance by reason of mental illness or injury, developmental

---

[3]Although the court mentioned that the defendant harmed the beneficiaries of the Spurgeons' wills, who were deprived of the proceeds of the Spurgeons' residual estates they would have received but for Chesteen's theft, we have not considered the heirs or legatees to be victims because their interests at the time were merely prospective and *in futuro*.

disability or other mental or physical incapacity." Tenn. Code Ann. § 34-11-101(7) (1996) (defining "[d]isabled person" for purposes of conservatorship law); see also Tenn. Code Ann. §§ 34-13-101–107 (setting forth provisions for appointing conservator for a disabled person). Thus, the Spurgeons were, virtually as a matter of law, particularly unable to resist the crime, summon help or testify at a later date. Thus, we believe this factor was properly applied to the defendant's theft conviction and is entitled to substantial weight.

Turning to the applicability of the particular vulnerability factor to the official misconduct conviction, we find it supported by the evidence, as well. The state has shown that at least some of the victims were minors. As clerk and master, the defendant had control of the minors' funds *because* they were minors. See, e.g., Tenn. Code Ann. § 35-7-208 (1996). We believe that the defendant's official misconduct sentence was properly enhanced based on this factor.

The trial court found that the defendant abused a position of trust in committing the offenses. See Tenn. Code Ann. § 40-35-114(15) (1997). The defendant does not challenge the application of this factor to the theft conviction. However, he argues that application of both factors (4) and (15) constitutes double enhancement in both cases because the funds were accessible to him by virtue of the victims' incapacity. In other words, he was in a position of conservator over the Spurgeons' funds because they were elderly and incapacitated, and as clerk and master he was in a position of trust over funds, including some of which were in his official custody due to the age and/or incapacity of the beneficiaries. See Tenn. Code Ann. § 40-35-114(15) (1997). This issue has been addressed by this court in a somewhat different context with an outcome adverse to Chesteen's argument. See State v. Jernigan, 929 S.W.2d 391, 396-97 (Tenn. Crim. App. 1996). We apply factor (15) in the theft case and assign it moderate weight in view of the application of factor (4).

As to the official misconduct conviction, we believe that the defendant is correct in claiming that the use of factor (15) constitutes impermissible double enhancement because the offense itself requires that the actor be a "clerk or clerk and master of any court," and by virtue of that office, he was in a position of trust. See Tenn. Code Ann. § 18-2-105 (1994). We agree that abuse of a position of public trust is not an available enhancement factor for offenses that involve malfeasance committed by public officials in their official capacity. See State v. David Keith Lane, No. 03C01-9607-CC-00259, slip op. at 9 (Tenn. Crim. App., Knoxville, June 18, 1997), aff'd on other grounds, 3 S.W.3d 456 (Tenn. 1999). The trial court misapplied this factor in the official misconduct case.

Although the trial court did not enhance Chesteen's sentence because the amount of money taken from the victims was particularly great, see Tenn. Code Ann. § 40-35-114(6) (1997), *de novo* consideration leads us to apply this factor to the official misconduct conviction. The undisputed evidence is that the defendant took in excess of $100,000; certainly, this is a particularly great amount in the context of this offense. We have considered but declined to apply this factor to the theft conviction related to the conservatorship. The defendant was convicted of theft of property valued at $10,000 but less than $60,000. The state auditors did not audit the defendant's handling of the conservatorship. The state did not establish with any precision the amount taken from the Spurgeons. There was some evidence of beginning and ending balances, but there was very little

evidence about the amount the defendant legitimately spent from the accounts for the Spurgeons' care. Thus, we cannot say that a preponderance of the evidence establishes that the amount taken in the theft offense was "particularly great."[4]

The defendant also argues that the trial court applied various non-statutory enhancement factors. We have considered each of the defendant's claims in context of the trial court's statements at the sentencing hearing, and we are unpersuaded. The claimed non-statutory enhancements are, in context, simply comments by the court about matters that the trial court was required to consider in arriving at the overall sentencing determination, including the length and manner of service of the sentence and the amount of restitution to be paid.

Next, we turn to the defendant's proffered mitigating factors. The trial court summarily found none; however, our *de novo* review reveals that some measure of mitigation is appropriate.

The defendant claims his conduct did not cause or threaten serious bodily injury. See Tenn. Code Ann. § 40-35-113(1) (1997). We apply little weight to this factor. As this court has noted, lack of serious bodily injury "is usually the case with surreptitious theft, committed outside the context of burglary . . . ." State v. Glen Adkins, No. 113, slip op. at 6 (Tenn. Crim. App., Knoxville, Feb. 16, 1989). Moreover, the fact that the defendant did not contemplate physical harm pales in comparison to the very significant amount of money he stole from his victims. See State v. Bilbrey, 816 S.W.2d 71, 77 (Tenn. Crim. App. 1991).

Chesteen also advocates that he should receive the benefit of mitigation because he was motivated to commit his crimes in order to provide himself and his family with necessities. See Tenn. Code Ann. § 40-35-113(7) (1997). The record reflects that the defendant supported his wife and her three children on his salary which began at around $21,000 and ended at around $38,000 to $39,000. During some of the earlier years that the defendant earned these wages, his wife worked as an apartment manager, earning $900 a month and having the privilege of a free apartment. In later years, the defendant's wife was unable to work. The three children attended college, one graduating and the other two finishing all but a few hours needed for graduation. Chesteen testified about his basic household expenses for utilities, housing and telephone service, and it is apparent that they

---

[4]We acknowledge that theft is a graded offense, and application of this enhancement factor is normally inappropriate. See State v. Grissom, 956 S.W.2d 514, 518 (Tenn. Crim. App. 1997). Although the state's evidence fails to point to any exceptions to this general rule, we have found exceptions in proper circumstances. See, e.g., State v. Johnnie Shane Capley, No. M1999-00353-CCA-R3-CD, slip op. at 7-8 (Tenn. Crim. App., Nashville, Dec. 29, 1999); State v. Mason Thomas Wilbanks, No. 01C01-9804-CR-00184, slip op. at 8 (Tenn. Crim. App., Nashville, May 21, 1999); State v. Brenda Kay Keefer, No. 03C01-9709-CC-00413, slip op. at 5-6 (Tenn. Crim. App., Knoxville, Feb. 10, 1999); State v. Barbara D. Frank, No. 03C01-9209-CR-00303 (Tenn. Crim. App., Knoxville, Dec. 22, 1993).

required a substantial portion of his paycheck apart from other expenses about which he did not testify, such as transportation, groceries, clothing and household necessities for his family of five. The defendant testified that he began taking the Spurgeons' money due to personal financial pressures and that the expenses were of a day-to-day nature, as opposed to extravagances. He also testified that he wanted the three children to have a good and happy start in life, although he did not want them to have a lavish lifestyle. The state's audit relative to the official misconduct conviction details an extensive listing of Chesteen's use of those funds. Numerous medical expenses are listed, although it is not clear whether these were expenses of the Chesteen family or the Spurgeons. There are payments to the telephone company, the utilities company, "Car Care," a grocery store, Wal-Mart and other entities which might fairly be construed as necessities. However, there are also payments for pager service, internet service, cellular phone service and cable television, all of which fall short of this court's interpretation of necessities. On balance, we believe the defendant has marginally established that this factor should be applied to his convictions; however, we afford it only slight weight. See State v. Gene Gruzella, No. 01C01-9401-CC-00002, slip op. at 7 (Tenn. Crim. App., Nashville, Aug. 23, 1994) (focus should be on motivation for the crime, as opposed to manner in which proceeds were spent); State v. Irene Hale, No. 287, slip op. at 4 (Tenn. Crim. App., Knoxville, July 11, 1989) (defendant who forged checks for Christmas gifts and food entitled to mitigation under prior sentencing act because expenditures were for necessities for her family). But cf. State v. Michael Bellew, No. 02C01-9510-CC-00324, slip op. at 6 (Tenn. Crim. App., Jackson, Feb. 27, 1997) (factor properly reserved for "individuals who, because of their destitution, choose to steal bread, milk, or other basic necessities for their children or themselves due to their dire circumstances").

Chesteen also claims his sentences should be mitigated because he was suffering from a mental or physical condition that significantly reduced his culpability for the offenses. See Tenn. Code Ann. § 40-35-113(8) (1997). Particularly, he claims he had a stressful home situation, suffered from anxiety and depression, and was taking Prozac, which may impair judgment and thinking. We have reviewed the medical and psychiatric evidence presented by the defendant, and we fail to see that this factor should be applied. While the defendant may have suffered stress as the head of his household prior to beginning his unlawful activities, by all indications it appears that his physical and mental health began declining after, and perhaps because of, his crimes. Furthermore, he has offered no evidence to demonstrate a cause and effect relationship between his psychiatric maladies, the medication he took, and how they served to render him less culpable. See State v. Marsha Trentham, No. 03C01-9811-CC-00405, slip op. at 9 (Tenn. Crim. App., Knoxville, Nov. 10, 1999) (factor not applied to defendant who had stressful home life and needed mental health treatment after the offense because there was no evidence that mental illness played a part in the offense itself); State v. Treva Strickland, No. 03C01-9611-CC-00427, slip op. at 10-11 (Tenn. Crim. App., Knoxville, Dec. 16, 1997) (factor (8) did not apply in part due to defendant's failure to prove how alleged mental condition served to significantly reduce culpability). But cf. State v. William J. Boylan, No. 01C01-9206-CC-00202, slip op. at 5 (Tenn. Crim. App., Nashville, Jan. 21, 1993) (depression, anxiety and suicidal ideation considered under mitigating factor (8) although they did not explain or justify the defendant's criminal conduct), perm. app. denied (Tenn. 1993).

Next, Chesteen implores the court to mitigate his sentences under the "catchall"

provision of the mitigation statute. See Tenn. Code Ann. § 40-35-113(13) (1997). He claims we should consider his remorse, the death of his father when the defendant was eight, his mental and physical maladies,[5] and his lack of a prior criminal record.

Remorse is, indeed, a proper mitigating factor if established by the evidence. State v. Williamson, 919 S.W.2d 69, 83 (Tenn. Crim. App. 1995). We are persuaded by the defendant's proffered remorse. The defendant and other witnesses, as well as letters written by the defendant's acquaintances, attested to his remorse. He testified that his health has deteriorated at least in part because of his actions. The claim of deteriorating health is corroborated by other evidence of record. On *de novo* review, we give moderate mitigating weight to the defendant's claim of remorse.[6]

We acknowledge that the death of a defendant's parent when the defendant is young may be a mitigating factor where appropriate. See State v. Moss, 727 S.W.2d 229, 240 (Tenn. Crim. App. 1986). However, we fail to see its propriety in this case. Granted, the defendant's sister testified that she and the defendant began working as children to earn money, and their lifestyle as children was spartan. However, the defendant came before the court for sentencing as a 39-year-old man who had assumed family responsibilities of his own some twenty years earlier. A high school teacher testified about his maturity as a student. By the accounts of many, the defendant led an exemplary life save his transgressions in this case. Given Chesteen's apparent positive development and maturity into adulthood despite hardship and the lack of a father, we decline to afford any mitigation for his father's death.

Chesteen also commends his poor mental and physical health to us as a mitigating factor. He has not explained, however, how his ill health equates with mitigation. See State v. Anthony Raymond Bell, No. 03C01-9503-CR-00070, slip op. at 6 (Tenn. Crim. App., Knoxville, Mar. 11, 1996), perm. app. denied (Tenn. 1996). It appears that the defendant's ill health may be of his own making due to his anxiety over the wrongdoing for which he stands before the court. We have already considered his remorse a mitigating factor, and we believe any weight that might arguably be appropriate for mitigation due to poor health has been accounted for in our consideration of remorse.

Finally, the defendant seeks mitigation because he has no prior criminal record. A court may, but is not required to, consider this factor in mitigation. See State v. Williams, 920

---

[5]He points to evidence of depression, anxiety, high blood pressure and ulcers.

[6]The state questions the sincerity of the defendant's remorse because he had not at the time of the sentencing hearing made any voluntary restitution payments to his victims. In light of the evidence that the defendant had been through bankruptcy proceedings, had been unemployed for several months after his employer learned about these offenses, had worked for a significant period of time earning approximately $8.00 per hour, and the fact that adversarial civil proceedings were pending, we decline to draw any inferences from the defendant's lack of voluntary restitution payments.

S.W.2d 247, 261 (Tenn. Crim. App. 1995). In this case, however, Chesteen's criminal conduct spanned a period of many years and involved ongoing, surreptitious theft which he accomplished and concealed by maintaining "unofficial" bank accounts, destroying records, and obtaining fraudulent court orders through deception of judges. Given these circumstances, we decline to afford any mitigation for lack of a prior criminal record.

Thus, enhancement factors applicable to the theft conviction are (3), (4) and (15), and the mitigating factors are (1), (7) and (13). For the official misconduct conviction, the enhancement factors are (3), (4) and (6), and the mitigating factors are (1), (7) and (13). Upon balancing these factors, we believe the comparatively lesser weight of the mitigating factors is far exceeded by the weightiness of the enhancement factors, especially factors (3) and (4). Thus, we arrive at six-year sentences for the two convictions, imposed to be served concurrently.

## 2. **Manner of Service.**

Next, we consider the manner of sentence service. The defendant came before the court as a presumed favorable candidate for alternative sentencing. See Tenn. Code Ann. § 40-35-102(6) (1997). This presumption may be rebutted, however, by evidence to the contrary. Id. Such "evidence to the contrary" is demonstrated by proof that

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant . . . .

Tenn. Code Ann. § 40-35-103(1) (1997).

The defendant is eligible for a community corrections sentence or a sentence involving probation, although the record reflects that community corrections placement is not available in Cocke County. See Tenn. Code Ann. § 40-36-106(a) (1997) (eligibility standards for community corrections, including defendants "convicted of property-related" offenses); Tenn. Code Ann. § 40-35-303(a) (generally establishing eligibility for probation when "the sentence actually imposed . . . is eight (8) years or less"). Also, when a defendant is eligible for probation, a sentencing court shall "automatically" consider ordering probation for the entire sentence or "as a part of its sentencing determination." Tenn. Code Ann. § 40-35-303(b) (1997). Unlike the presumption of favorable candidacy for alternative sentencing in general, a defendant bears the burden of demonstrating the suitability of probation, in particular. State v. Bingham, 910 S.W.2d 448, 455 (Tenn. Crim. App. 1995). To meet that burden, the defendant must show that probation will "subserve the ends of justice and the best interest of both the public and the defendant." Id. at 456 (citation omitted).

It is beyond question that factors (A) and (C) of section 40-35-103(1) do not apply to this defendant, who has no prior criminal history. Therefore, only factor (B), necessity to avoid

depreciating the seriousness of the offense or the need to provide deterrence to others, provides the only possible basis for overcoming the presumption of favorable candidacy for alternative sentencing and for imposing confinement. The need for deterrence must be demonstrated by the proof of record. See, e.g., State v. Ashby, 823 S.W.2d 166, 170-71 (Tenn. 1991); State v. Zeolia, 928 S.W.2d 457, 461 (Tenn. Crim. App. 1996).

We conclude that the need to avoid depreciating the seriousness of the offense is an appropriate basis for imposing a sentence involving confinement. The circumstances of the offense cannot be used as the sole basis for denying an alternative sentence unless they are "especially violent, horrifying, shocking, reprehensible, offensive, or otherwise of an excessive or exaggerated degree." State v. Housewright, 982 S.W.2d 354, 357 (Tenn. Crim. App. 1997) (citations omitted), perm. app. denied (Tenn. 1998). Upon *de novo* consideration, the evidence supports a conclusion that the offenses in the present case are excessive. The defendant stole very large sums of money from elderly, incapacitated ladies over whose funds he served as conservator and from children and others whose funds were entrusted to him as a public servant. He maintained secret accounts, prepared and presented fraudulent orders to the court, and destroyed incriminating records. His conduct went on for a period of several years. Cf. State v. Debra L. Trotter, No. 02C01-9811-CR-00347, slip op. at 6-7 (Tenn. Crim. App., Jackson, Dec. 30, 1999) (defendant's criminal conduct was "excessive" where she presented and paid fraudulent invoices through employer's account well in excess of $100,000 over three-year period) (Hayes, J., dissenting on denial of alternative sentencing). But cf. State v. Grissom, 956 S.W.2d 514, 520 (Tenn. Crim. App. 1997) (although theft of almost $30,000 from employer was serious, circumstances did not rise to level of outweighing all other factors in favor of alternative sentencing). Accordingly, we conclude that the circumstances of the offense overcome the section 40-35-102(6) presumption of favorable candidacy for alternative sentencing and support the imposition of a measure of confinement. See State v. Yvette S. Almon, No. 02C01-9711-CR-00434, slip op. at 8 (Tenn. Crim. App., Jackson, Dec. 30, 1999); State v. Bingham, 910 S.W.2d 448, 456 (Tenn. Crim. App. 1995).

In the present case, however, the record reflects that partial probation is in the best interests of the public. To be sure, the defendant manipulated the courts in order to defraud innocent persons, and accordingly, some confinement serves the ends of justice. On the other hand, confinement for the duration of the sentence seriously hampers the public interest in seeing that the defendant's victims are reimbursed for their losses. Accordingly, we conclude upon *de novo* review that a sentence of split confinement is appropriate in this case. The six-year effective sentence shall be served as follows: one year in continuous confinement, followed by fourteen years probation[7] [8]

---

[7]The one year of *continuous* confinement hereby imposed establishes a release eligibility date that arrives nine and one-half months sooner than the release eligibility date for the six-year sentence as imposed by the trial court. See Tenn. Code Ann. § 40-35-112(a)(3) (1997).

[8]The state conceded at oral argument that a sentence of some confinement coupled with some probation was an equitable resolution. In balancing the circumstances of the offense with the Sentencing Act's goal of providing for restitution of victims where possible, we agree. Cf. State v.

-11-

See Tenn. Code Ann. § 40-35-306(a) (1997) (prescribing probation "for a period of time up to and including the statutory maximum time for the class of the conviction offense); Tenn. Code Ann. § 40-35-112(c)(3) (1997) (establishing fifteen years as the maximum sentence for Class C felonies (Range III)). The lengthy period of probation will accommodate a meaningful opportunity to make restitution, an issue addressed in the next section of this opinion.

### 3. Restitution.

Having considered the manner of service of the sentence, we move on to the issue of restitution. The trial court's judgments and the transcript of the sentencing hearing reflect that the court ordered no restitution for the theft conviction and restitution of $101,821.73 to be paid to the office of the clerk and master for the official misconduct conviction.

The amount of restitution a defendant is ordered to pay as a condition to probation must be based upon the victim's pecuniary loss and the financial condition and obligations of the defendant. Tenn. Code Ann. § 40-35-303(d)(10), -304(d) (1997); State v. Smith, 898 S.W.2d 742, 747 (Tenn. Crim. App. 1994). In such a case, the trial court must determine the actual loss based on realistic values, the amount of restitution need not equal or mirror the exact pecuniary loss of the victim, and the trial court must consider the defendant's ability to pay given his current means and his likely ability to pay in the future. Smith, 898 S.W.2d at 747. The amount of restitution ordered as a condition to probation must be reasonable and one that the defendant can reasonably be expected to pay during his probationary period. Tenn. Code Ann. § 40-35-304(d) (1997); Smith, 898 S.W.2d at 747.

At the outset, we discern errors of law in the trial court's judgments as they relate to the matter of restitution. In the official misconduct conviction, restitution was not available to the trial court in conjunction with a sentence of total confinement. State v. Davis, 940 S.W.2d 558 (Tenn. 1997). Davis holds that, based on the sentencing law as it existed for crimes committed prior to July 1, 1996, restitution could not be ordered when total confinement was imposed. Id. at 561-62. Substantially all of the defendant's clerk and master thefts occurred before the July 1, 1996 effective date of the amendment to Code section 40-35-104 which changed the law to allow for restitution orders in total confinement sentences. See id. at 561, n. 6; Tenn. Pub. Acts ch. 669 (effective July 1, 1996) (amending Tennessee Code Annotated section 40-35-104(c)). Thus, Davis applies to the bulk of the clerk and master thefts.[9]

---

Lynda Gayle Kirkland, No. 03C01-9606-CR-00248, slip op. at 8-9 (Tenn. Crim. App., Knoxville, Feb. 12, 1997) (trial court set length of sentence at eight years rather than more lengthy term so that defendant would be eligible for probationary sentence coupled with payment of restitution).

[9]The record does reflect that the defendant took $16,217.23 of Mantooth's funds on August 29, 1996, two days before leaving office and two months after the amendment to Code section 40-35-104(c).

In the theft case, the trial court's error is the failure to order restitution. The court was not hampered by Davis in ordering both total confinement and restitution. Davis was predicated upon the restitution provisions of the general sentencing law. See Davis, 940 S.W.2d at 561. However, restitution in theft cases is mandated and controlled by a specific provision found in Code section 40-20-116(a):

> Whenever a felon is convicted of stealing or feloniously taking or receiving property, or defrauding another thereof, the jury shall ascertain the value of such property, if not previously restored to the owner, and the court shall thereupon, order the restitution of property, and in case this cannot be done, that the party aggrieved recover the value assessed against the prisoner, for which execution may issue if necessary.

Tenn. Code Ann. § 40-20-110(a) (1997). This provision requires that upon the defendant's waiver of jury trial, the court establish an amount of restitution for the defendant to pay.

We have now imposed sentences involving probation, and the Davis limitation no longer attends the official misconduct conviction. Thus, restitution is in order on both convictions. Because the sentences as originally imposed did not involve probation, and the trial court was not required to make the section 40-35-304(d) determinations about the defendant's ability to pay, the record contains no findings in this regard. Moreover, although the record reflects the defendant's current income, it contains no evidence about the defendant's current expenses. Obviously, the trial court made no findings about the unreimbursed losses in the theft cases, and we cannot discern those losses on the existing record. Because we cannot conduct necessary *de novo* determinations on the record, the case must be remanded to the trial court with instructions to fulfill its statutory requirements establishing appropriate amounts of restitution.

In determining restitution in the theft case, the trial court should be aware of a distinction between the sanction of levy upon execution provided in Code section 40-20-116(a) and restitution as a condition of probation pursuant to section 40-35-304. Even though section 40-20-116 is not a part of the Criminal Sentencing Reform Act of 1989, it provides for an order of restitution in theft cases, and section 40-35-304 in the sentencing act permits, but does not require, that restitution be made a condition of probation. However, we believe that to the extent that the trial court wishes to impose restitution as a condition of probation, whether the restitution itself is authorized by the sentencing act or mandated by section 40-20-116(a), the court must comply with the provisions of the sentencing act and Smith relative to the amount being reasonable and based upon the defendant's financial ability. See Smith, 898 S.W.2d at 747; Tenn. Code Ann. § 40-35-404(d) (1997) (court shall consider "the financial resources and future ability of the defendant to pay or perform"). Nevertheless, if this determination leads the court to establish an amount of restitution that is less than the theft victim's pecuniary loss, section 40-20-116(a) contemplates the court establishing the deficiency amount – that is, the difference between the amount that is ordered as a condition to probation and the total amount of the loss. This deficiency amount is subject to collection by execution as in the case of a judgment.

Section 40-20-116(a) allows for the restitution of property "not previously restored

-13-

to the owner," and section 40-35-304(b) speaks of the victim's "pecuniary loss."  Thus, in the theft case, the trial court on remand must endeavor to ascertain the victims' loss after giving credit for the funds restored to the victims' accounts by the defendant.

We know that the trial court's task with respect to restitution under the probation provisions is to establish the amount of loss and determine the defendant's *future* ability to pay. Tenn. Code Ann. § 40-35-304(d) (1997).  We recognize that the imposition of a year of confinement might result in the defendant losing his current position of employment and might make his future ability to pay difficult to determine.  However, we remind the parties that Code section 40-35-304(f) provides that either party - or a victim - may apply "at any time" to the sentencing court to "adjust or otherwise waive payment . . . [of] restitution or any unpaid . . . portion thereof."  Tenn. Code Ann. § 40-35-304(d) (1997).  The section empowers the court, upon notice and hearing, to make appropriate future adjustments to the restitution provisions of the sentencing order.

### 4.  Judicial Diversion.

The defendant's remaining appellate issue is whether the trial court erred in denying judicial diversion.  With respect to judicial diversion, the Sentencing Reform Act of 1989 provides in pertinent part:

> If any person who has not previously been convicted of a felony or a Class A misdemeanor is found guilty or pleads guilty to . . . a Class C, D, or E felony, the court may, without entering a judgment of guilty and with the consent of such person, defer further proceedings and place the person on probation upon such reasonable conditions as it may require and for a period of time not less than the period of the maximum sentence . . . of the felony with which he is charged. . . .

Tenn. Code Ann. § 40-35-313(a)(1) (1997). This procedure, commonly known as judicial diversion, is similar to pretrial diversion; however, judicial diversion follows a determination of guilt and the decision to grant diversion rests with the trial court, not the prosecutor. State v. Anderson, 857 S.W.2d 571, 572 (Tenn. Crim. App. 1992).

Tennessee Code Annotated section 40-35-313 does not entitle the accused to the presumption of favorable candidacy created by Tennessee Code Annotated section 40-35-102(6). The lower court's denial of judicial diversion is subject to reversal on appeal only if that court abused its discretion. State v. Hammersley, 650 S.W.2d 352, 356 (Tenn. 1983). When a defendant challenges the denial of judicial diversion, we may not revisit the issue if the record contains any substantial evidence supporting the trial court's decision. Id.; State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996).

In determining whether to grant judicial diversion, the trial court must consider
(a)  the accused's amenability to correction,
(b)  the circumstances of the offense,
(c)  the accused's criminal record,
(d)  the accused's social history,
(e)  the accused's physical and mental health,

> (f)     the deterrence value to the accused as well as others, and
>
> (g)     whether judicial diversion will serve the interests of the public as well as the accused.

Parker, 932 S.W.2d at 958; State v. Bonestel, 871 S.W.2d 163, 168 (Tenn. Crim. App. 1993). Moreover, the record must reflect that the court has weighed all of the factors in reaching its determination. Bonestel, 871 S.W.2d at 168 (citations omitted). The court must explain on the record why the defendant does not qualify under its analysis, and if the court has based its determination on only some of the factors, it must explain why these factors outweigh the others. Id.

In this case, although the trial court denied judicial diversion, it failed to address the issue on the record. However, we discern from the record that substantial evidence exists to support the denial of judicial diversion. See State v. Electroplating, 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998).

The factors weighing in favor of diversion include Chesteen's amenability to correction as evidenced by his remorse and support of family and friends, his lack of a criminal record, and his positive social history of living a productive lifestyle over the years aside from committing these offenses. We consider the status of his physical and mental health to be a neutral consideration in this case because it is not reflective positively or negatively on his likelihood of success on a diversionary program, and ultimately, rehabilitation. Likewise, we consider the deterrence value to the accused and others to be a neutral consideration. Weighing negatively for diversion are the circumstances of the offense and the interests of the public and the accused. We are particularly concerned about the aggravated nature of the defendant's crimes in that they took place over a course of years, involved fraud upon the courts, destruction of records, and covert bank accounts. When the circumstances of the offense are considered in connection with the interests of the public in seeing meaningful punishment meted out for a crime involving large sums of money taken in the manner as was done here, it is clear that the public's interests are not served by judicial diversion in this case. Morever, it would be illogical to grant a defendant who was not entitled to a grant of full probation an even more favorable form of punishment in the form of judicial diversion. Thus, the interests of the defendant are not best served by diversion. We conclude that the factors weighing against diversion are far weightier than those favoring diversion. For this reason, the trial court did not abuse its discretion in denying judicial diversion.

## Conclusion

In summary, we affirm the length of the six-year effective sentences but modify the manner of service to one year's continuous confinement followed by a probationary period of fourteen years, reverse the trial court's determinations regarding restitution, remand to that court for a determination of proper restitution, and affirm the trial court's denial of judicial diversion.